69 U.S. 450 (1864)
2 Wall. 450
STEAMSHIP COMPANY
v.
JOLIFFE.
Supreme Court of United States.

*454 *455 Messrs. Cope, Yale, and Carlisle, for the defendant in error; McCullough representing the State of California.
Mr. Justice FIELD delivered the opinion of the court.
This case arises upon the act of the State of California, of the 20th of May, 1861, entitled "An act to establish pilots and pilot regulations for the port of San Francisco." The act provides for the creation of a Board of Pilot Commissioners, and authorizes the board to license such number of pilots for the port as it may deem necessary, and prescribes their qualifications, duties, and compensation. It makes it a misdemeanor, punishable by fine or imprisonment, for any person not having a license from the board, to pilot any ship or vessel in or out of the port by way of the "Heads," that is by the way which leads directly to and from the ocean. It enacts that "all vessels, their tackle, apparel, and furniture, and the masters and the owners thereof, shall be jointly and severally liable for pilotage fees, to be recovered in any court of competent jurisdiction." And it declares, that when a vessel is spoken by a pilot and his services are declined, he shall be entitled to one-half pilotage fees, except when the vessel is in tow of a steam-tug outward bound, in which case no charge shall be made, unless a pilot be actually employed.
On the 1st of November, 1861, the plaintiff in the court below, the defendant in error in this court, was a pilot for the port of San Francisco, having been regularly appointed and licensed by the board created under the act of the State. At that time the steamship Golden Gate was lying in the port, and about to proceed to Panama, carrying passengers and treasure. This vessel was then, and ever since 1852, had been an American ocean steamer, registered at the custom-house, in the port of New York, and exclusively employed in navigating the ocean, and carrying passengers and treasure between San Francisco and Panama, and was owned by the Pacific Mail Steamship Company, a corporation created under the laws of the State of New York. To the master of this steamship the plaintiff offered his services *456 to pilot the vessel to sea; but his services were refused, and to recover the half-pilotage fees allowed in such cases by the act of 1861, the present action was brought.
At the last term of this court, it was suggested that the constitutionality of the act in question was involved in the decision of the case; and the court thereupon reserved its consideration until the State of California could be represented. The Attorney-General of the State has accordingly appeared and filed a brief in the case. Since the action of the court in this respect, the legislature of California has passed a new statute on the subject of pilots and pilot regulations for the port of San Francisco, re-enacting substantially the provisions of the original act, but at the same time in terms repealing that act. And the first point made by the Attorney-General is, that, by reason of the repeal, the present action cannot be maintained. His position is, that as the claim to half-pilotage fees was given by the statute, the right to recover the same fell with the repeal of the statute; and that this court must dismiss the writ of error on that ground.
The claim to half-pilotage fees, it is true, was given by the statute, but only in consideration of services tendered. The object of the regulations established by the statute, was to create a body of hardy and skillful seamen, thoroughly acquainted with the harbor, to pilot vessels seeking to enter or depart from the port, and thus give security to life and property exposed to the dangers of a difficult navigation. This object would be in a great degree defeated if the selection of a pilot were left to the option of the master of the vessel, or the exertions of a pilot to reach the vessel in order to tender his services were without any remuneration. The experience of all commercial states has shown the necessity, in order to create and maintain an efficient class of pilots, of providing compensation, not only when the services tendered are accepted by the master of the vessel, but also when they are declined. If the services are accepted, a contract is created between the master or owner of the vessel *457 and the pilot, the terms of which, it is true, are fixed by the statute; but the transaction is not less a contract on that account. If the services tendered are declined, the half fees allowed are by way of compensation for the exertions and labor made by the pilot, and the expenses and risks incurred by him in placing himself in a position to render the services, which, in the majority of cases, would be required. The transaction, in this latter case, between the pilot and the master or owners, cannot be strictly termed a contract, but it is a transaction to which the law attaches similar consequences; it is a quasi contract. The absence of assent on the part of the master or owner of the vessel does not change the case. In that large class of transactions designated in the law as implied contracts, the assent or convention which is an essential ingredient of an actual contract is often wanting. Thus, if a party obtain the money of another by mistake, it is his duty to refund it, not from any agreement on his part, but from the general obligation to do justice which rests upon all persons. In such case the party makes no promise on the subject; but the law, "consulting the interests of morality," implies one; and the liability thus arising is said to be a liability upon an implied contract.[*] The claim for half-pilotage fees stands upon substantially similar grounds.
"There are many cases," says Mr. Justice Curtis, speaking for this court, "in which an offer to perform, accompanied by present ability to perform, is deemed by law equivalent to performance. The laws of commercial states and countries have made an offer of pilotage services one of those cases."[]
The claim of the plaintiff below for half-pilotage fees, resting upon a transaction regarded by the law as a quasi contract, there is no just ground for the position that it fell with the repeal of the statute under which the transaction was had. When a right has arisen upon a contract, or a transaction in the nature of a contract authorized by statute, *458 and has been so far perfected that nothing remains to be done by the party asserting it, the repeal of the statute does not affect it, or an action for its enforcement. It has become a vested right which stands independent of the statute. And such is the position of the claim of the plaintiff below in the present action: the pilotage services had been tendered by him; his claim to the compensation prescribed by the statute was then perfect, and the liability of the master or owner of the vessel had become fixed.
And it is clear that the legislature did not intend by the repealing clause in the act of 1864, to impair the right to fees, which had arisen under the original act of 1861. The new act re-enacts substantially all the provisions of the original act, relating to pilots and pilot regulations for the harbor of San Francisco. It subjects the pilots to similar examinations; it requires like qualifications; it prescribes nearly the same fees for similar services; and it allows half-pilotage fees under the same circumstances as provided in the original act. It appears to have been passed for the purpose of embracing within its provisions the ports of Mare Island and Benicia, as well as the port of San Francisco; of creating a Board of Pilot Examiners for the three ports, in place of the Board of Pilot Commissioners for the port of San Francisco alone, and of prohibiting the issue of licenses to any persons who were disloyal to the Government of the United States. The new act took effect simultaneously with the repeal of the first act; its provisions may, therefore, more properly be said to be substituted in the place of, and to continue in force with modifications, the provisions of the original act, rather than to have abrogated and annulled them. The observations of Mr. Chief Justice Shaw, in Wright v. Oakley,[*] upon the construction of the Revised Statutes of Massachusetts, which in terms repealed the previous legislation of the State, may with propriety be applied to the case at bar.
"In construing the revised statutes and the connected *459 acts of amendment and repeal, it is necessary to observe great caution to avoid giving an effect to these acts which was never contemplated by the legislature. In terms, the whole body of the statute law was repealed; but these repeals went into operation simultaneously with the revised statutes, which were substituted for them, and were intended to replace them, with such modifications as were intended to be made by that revision. There was no moment in which the repealing act stood in force without being replaced by the corresponding provisions of the revised statutes. In practical operation and effect, therefore, they are rather to be considered as a continuance and modification of old laws than as an abrogation of those old and the reenactment of new ones."
On the trial in the court below two grounds were urged in defence of the action: 1st, the unconstitutionality of the act of the State of May 20, 1861; and, 2d, the repugnancy of its provisions to the act of Congress of August 30, 1852. Similar grounds were urged in this court for the reversal of the judgment.
The unconstitutionality of the act was asserted from its alleged conflict with the 3d clause of the 8th section of the 1st article, which declares that "the Congress shall have power to regulate commerce with foreign nations, and among the several States, and with the Indian tribes." The power conferred by this clause is without limitation; it extends to all the subjects of commerce, and to all persons engaged in it; it embraces traffic, navigation, and intercourse, and necessarily, therefore, the whole subject of pilots and pilotage. But the clause does not, in terms, exclude the exercise of any authority by the States to regulate pilots. On the contrary, the authority of the States to regulate the whole subject, in the absence of legislation on the part of Congress, has been recognized from the earliest period of the Government. On the formation of the Union there were laws in force in the different States bordering on the sea for the regulation of pilots and pilotage; and at its first session, in 1789, Congress passed an act adopting the existing regulations and *460 such as might be provided by subsequent legislation of the States. The act reads as follows: "All pilots in the bays, inlets, rivers, harbors, and ports of the United States, shall continue to be regulated in conformity with the existing laws of the States respectively wherein such pilots may be, or with such laws as the States may respectively hereafter enact for the purpose, until further legislative provision shall be made by Congress." In 1837, another act was passed making it "lawful for the master or commander of any vessel coming in or going out of any port, situate upon the waters which are the boundary between two States, to employ any pilot duly licensed or authorized by the laws of either of the States." No other legislation has been had by Congress impairing the right of the States to adopt such system for the regulation of port pilots as they might deem best, unless it be found in the act of August 30, 1852.
It is insisted by the plaintiff in error that this act of 1852 is in conflict with the provisions of the act of the State of May, 1861; that in fact it has superseded all State legislation concerning port pilotage, so far as steamers carrying passengers are concerned, and to that extent has modified or repealed the act of 1789.
From a careful examination of the act of 1852 we have arrived at a different conclusion. We do not perceive in its provisions any intention to supersede the State legislation recognized by the act of 1789, or any inconsistency with the local port regulations established by the act of California of 1861. The act of 1852 was intended, as its title indicates, to provide greater security than then existed for the lives of passengers on board of vessels propelled in whole or part by steam. Previous to its passage frequent accidents, occasioning in some instances great loss of life, occurred to steamers, arising from the imperfect construction of the vessel, defective machinery, inadequate protection against fires, the carrying of dangerous articles, or the want of pumps, life-boats, and other means of escape in case of danger. To guard against accidents from these and like sources was the general purpose of the act of 1852. It therefore contains provisions *461 relating to fires, pumps, boats, life-preservers, buckets, the means of escape from the lower to the upper deck, the carrying of gunpowder, camphene, and other dangerous articles, and their stowage. It also provides for the appointment of two inspectors, one of whom is to possess a practical knowledge of shipbuilding and the uses of steam in navigation, and the other is to possess knowledge of and experience in the duties of an engineer of steam-vessels, and of the construction and use of boilers and machinery and appurtenances connected with them, and the two are required to make an examination of the hulls of the vessels, to inspect and test the boilers and machinery, and to require licenses to be obtained before dangerous articles can be taken aboard.
The act contains few provisions relating to pilots; indeed, it was not directed to the remedy of any evils of the local pilot system. There were no complaints against the port pilots; on the contrary, they were the subjects of just praise for their skill, energy, and efficiency. The clauses respecting pilots in the act relate, in our judgment, to pilots having charge of steamers on the voyage, and not to port pilots; and the provision that no person shall be employed or serve as a pilot who is not licensed by the inspectors has reference to employment and service on the voyage generally, and not to employment and service in connection with ports and harbors.
Thus the ninth section speaks of a vessel leaving her port with a complement of engineers and pilots, and provides for temporarily supplying the deficiency in case she is deprived of their services on her voyage.[*] And, again, the same section speaks of pilots as belonging to the vessels on which they are employed, and requires them to assist in the inspection of the vessels,  language which is entirely inappropriate to local or port pilots, whose employment lasts but a few hours, and who have no connection with any vessel except to bring into or take it out of port.[]
The term pilots is equally applicable to two classes of per *462 sons,  to those whose employment is to guide vessels in and out of ports, and to those who are intrusted with the management of the helm and the direction of the vessel on her voyage.[*] To the first class, for the proper performance of their duties, a thorough knowledge of the port in which they are employed is essential, with its channel, currents, and tides, and its bars, shoals, and rocks, and the various fluctuations and changes to which it is subject. To the second class, knowledge of entirely a different character is necessary. Yet the act in question does not require the inspectors, who are to license pilots under its provisions, to possess any knowledge of the harbors for which, under the theory of the plaintiff in error, pilots are to be licensed, or to exact any such knowledge from the pilots themselves. They are to issue their license to a pilot when satisfied, from "inquiry as to his character and merits," that he "possesses the requisite skill, and is trustworthy and faithful." The qualifications thus required may be sufficient for the pilot of the steamer on her voyage at sea, but are entirely insufficient for the intricacies of harbor navigation.
On the argument at the bar much stress was laid by counsel for the plaintiff in error upon the language of the first clause of the ninth section, as indicating an intention to supersede State legislation on the subject of port pilotage. That section declares "that instead of the existing provisions of law for the inspection of steamers and their equipment, and instead of the present system of pilotage of such vessels, and the present mode of employing engineers on board the same," certain regulations should be observed as prescribed by the act. But in our judgment the section excludes the inference drawn by counsel. No explanation is given as to the meaning of the term "system," as here used; but it is clear that it does not refer to any system established by law. The section supersedes in express terms "existing provisions of law" for the inspection of steamers and their equipment, but it uses different language when speaking of pilotage. If *463 the section had also been directed against the law recognizing State regulations in respect to port pilotage, the intention of Congress in that respect would undoubtedly have been expressed with equal clearness, and not left to be implied from the use of an indefinite and ambiguous term.
The act does not purport to establish regulations for port pilotage; and we cannot suppose that in a measure intended to give greater security to life Congress would have swept away all the safeguards in this respect provided by State legislation without substituting anything in their place. Under the act the ports may be left entirely without resident or local pilots, for it does not require the appointment of such pilots, though the necessity for them must have been obvious. Having omitted this important requirement, the act omits of course all provisions as to the number of pilots, their duties, responsibilities, and compensation. These are matters of the greatest consequence, are contained in all State regulations, and without them no effective system can ever be established.
JUDGMENT AFFIRMED.
Mr. Justice MILLER (with whom concurred WAYNE and CLIFFORD, JJ.) dissenting:
In this case seven members of the court heard the argument and participated in its decision. Of this number only four concur in the judgment and opinion of the court. These facts, as well as the importance of the main question whether the act of the California legislature concerning pilots is in conflict with the act of Congress of 1852 on the same subject, and, therefore, void, justify a statement of the views of the minority.
There was a preliminary point, however, raised by the Attorney-General of California, much pressed and well argued on both sides, on which I had hoped the case would have been decided without reaching the question just stated; a point I think well taken, and fully sustained by the authorities. The proposition is, that the statute of California *464 under which plaintiff below recovered his judgment, has been repealed since the writ of error was sued to this court; and that the action being wholly dependent on the statute, the repeal takes away the right, and the judgment which he has obtained must be reversed, and the case dismissed.
That the 26th section of the act of April 4th, 1864,[*] does, in express terms, repeal the act under which plaintiff's proceeding was instituted, is not denied. It is equally clear that there is no clause in the act of 1864 saving rights which had accrued under the act repealed. I take the law to be well settled that a right of action not growing out of contract, but which is solely dependent upon a statute, ceases and determines with the statute on which it depends.
One of the earliest cases on that subject is Miller's Case.[] That was a case in which Miller had been made, under a compulsory clause in a statute of insolvency, to give in a schedule of his property, and deliver it up to his creditors. The statute then authorized a discharge from all his debts. He accordingly moved for such discharge. But the justices of the county court for some reason delayed this from time to time, until the compulsory clause of the act was repealed, and then refused it altogether. On an application for mandamus in the King's Bench, Lord Mansfield held that the repeal of the law carried with it the right to a discharge, and overruled the application. In Surtees v. Ellison,[] where the same question was raised on an act repealing the bankrupt law then in existence, Lord Tenterden said, that notwithstanding the disastrous effect of the repeal on previous cases of bankruptcy, and on proceedings then in progress under the act, they were not at liberty to break in upon the general rule. In the subsequent case of Key v. Goodwin,[§] Tindal, C.J., says: "I take the effect of the repealing statute to be to obliterate the repealed statute as completely from the records of Parliament as if it had never passed, and that it must be considered as a law that never existed, except for *465 the purpose of those actions or suits which were commenced, prosecuted, and concluded while it was an existing law."
This principle is also sustained by numerous American cases, cited in the note below.[*]
It is maintained, however, that in this court, on a writ of error, we can only determine if there was error in the record as the law stood at the time the decision of the court was made, which is brought here for review.
In the cases of Hartung v. The People, and Sanches v. The People,[] which are very recent cases, and were much considered, the Court of Appeals of New York unanimously held, that while on a writ of error, the case must be decided on the record as made in the court below, the question of error or no error must be determined by the law as it stands at the time the case is heard in the Court of Appeal. Such, also, is the decision in the Pennsylvania case of Commonwealth v. Duane,[] which was an indictment for libel, in which the statute on which it was founded was repealed after the defendant had been found guilty in the court below, and the appellate court held that for that reason the case must be reversed, and the libel dismissed. Lewis v. Foster,[§] in the Supreme Court of New Hampshire, decides the same thing on a case of review under their statute. The cases of Yeaton v. United States,[] and Schooner Rachel,[¶] in this court, decide, that on appeal from an admiralty decree, that decree will be reversed, because the law under which the vessel became forfeited had expired by its own limitation pending the appeal, although the vessel had been sold and the money paid into the Treasury of the United States before the statute expired.
Unquestionably, the appellate tribunal is bound to take *466 judicial notice of the repealing statute. If so, I fail to see how it can affirm a judgment, which, by the law in existence at the time of such affirmance, has become erroneous, though not so when rendered. And so are the authorities without exception, as far as I am aware.
But it is said that plaintiff, by his judgment in the court below, acquired a vested right to the sum of money for which he recovered that judgment, which could not be taken away by a repeal of the act.
I deny that a party suing another for a statute penalty can acquire a vested right in the sum which the law allows in such cases, until he has actually received the money into his own possession. Such is evidently the principle deducible from the cases of Yeaton v. United States, and the Schooner Rachel, above referred to. Such is also the express decision of this court in the case of Norris v. Crocker,[*] except that in that case the repeal took place while the suit was pending and before judgment. This court held, in the language of Judge Catron, that, "as the plaintiff had no vested right in the penalty, the legislature might discharge the defendant by repealing the law."
A judgment is only one of the steps in the progress of a suit by which the plaintiff, if successful, obtains what he is seeking. It only declares the right of the party, but does not create it. It may be set aside or reversed, and gives the plaintiff no right superior to that which he had before he obtained it.
If the claim on which he proceeded was a vested right, it remains so after judgment; not because of the judgment, but because it existed before, and the judgment only ascertains that fact, and enables him to enforce it. If the judgment was founded on a statute right, it still only declares that on the facts as the law then stood, the plaintiff was entitled to recover; but that right is no more sacred or no more protected from legislative action than before. If there is such a thing as a vested right in a statute penalty, it must become *467 vested either when the facts occur which give the right, or when the plaintiff makes his claim to the benefit of the statute by commencing an action for the sum which the law allows. That no such right accrues from either of those circumstances, the cases which I have last cited seem conclusive.
But it is said that although the act of April 4th, 1864, repeals the prior act, it re-enacted the same provisions on the subject of pilots, and that this operates as a continuance of the former law. It may be answered that if such were the intention of the framers of the new law, the repealing clause is not only useless, but, if effectual, it must operate to defeat that intention. In the next place, the appropriate and usual mode of expressing such an intention is by a saving clause; and, lastly, by a well-settled rule of construction, the new statute can have no retrospective operation, unless by its own express language, or by necessary implication,  neither of which exist in this case. The case of the Board of Trustees v. City of Chicago,[*] was one where proceedings to condemn property for public use were instituted under the city charter. While they were pending, the legislature passed an act which amounted to a new charter, but which contained no repealing clause. The Supreme Court held that the new charter by implication repealed the old one; and although it granted the right to condemn as the other one had done, yet the right to proceed under the old charter was gone, and the party must begin and proceed under the new one.
No authority, I believe, can be found to controvert this principle. The remark of C.J. Shaw concerning the necessity of so construing the Revised Statutes of Massachusetts, when the entire laws of the State had been revised and re-enacted, as to prevent a total lapse of all rights existing under the statutes thus revised, can have no application to the case of a single statute expressly repealed by a clause in a new law on the same subject.
It is contended by counsel in the argument that the judgment *468 in this case is based on contract, and that no repeal of the statute by State law can impair its obligation. This idea seems to me without foundation. The statute enacts, for the protection of the pilots of San Francisco, that a vessel approaching or leaving the harbor shall employ the first pilot, licensed under that law, who offers his services; and if the officers of the boat refuse, it renders the owners liable in an action by that pilot to half the usual pilot fees. If the officers of the vessel accept the pilot and his services, unquestionably the law implies a contract to pay either what they may reasonably be worth, or the sum fixed by statute. But if they refuse to accept him or his services, they violate the law; for which violation it imposes the penalty of half the usual pilot fees. Here is no element of contract; no consent of minds; no services rendered for which the law implies an obligation to pay. It is purely a case of a violation of the law in refusing to perform what it enjoins, and the enforcement of the penalty for the benefit of the party injured. It is just as easy to see a contract in a hundred other cases where the law imposes a penalty for its violation, and gives an action of debt for the recovery of that penalty.
It is my opinion, then, that we should have reversed the judgment, and ordered the dismissal of the case on the grounds just discussed.
As regards the merits of the case, it seems to me still clearer that the judgment should have been reversed. The case of Cooley v. The Board of Wardens,[*] raises the question of the relation of pilots and pilotage to commerce, and holds that the power of regulating pilots by law, and framing a system for their government and control, is clearly conferred upon Congress by the Constitution. It also holds that in the absence of the exercise of that power by Congress, the States may provide such rules and regulations on the subject as may be necessary and proper; but the implication is forcible, that if any such regulation is in conflict with any act of Congress, *469 it is void; and, indeed, that if Congress has legislated on the same subject with a view to provide a system of rules, that there is no place left for State legislation. The proposition is too plain for argument, that, if Congress has power to pass such laws, and has passed them, any act of a State legislature in conflict with them must necessarily be void. I do not understand the majority of the court to controvert this principle, or even to deny that if Congress has legislated on this precise subject, and provided rules for this very class of cases, that then the act of the legislature of California is to that extent void. But the precise point of difference between us is, that while I contend that an act of Congress of August 30th, 1852, covers the subject-matter of the statute of California under which defendant in error claims, they deny that it does cover the case, or was intended to apply to pilots of harbors and ports of the several States.
That act is in terms confined to vessels propelled in whole or in part by steam; and its object, as stated in the title, is the better security of the lives of passengers on board such vessels. The ninth section of the act, which is a very long section, composed of fifteen subsections, opens by declaring, "That instead of the existing provisions of law for the inspection of steamers and their equipments, and instead of the present system of pilotage of such vessels, and the present mode of employing engineers on board the same, the following regulations shall be observed, to wit." Here, then, is a declaration that it is the purpose of the act to abolish the old systems, and establish new ones on three distinct subjects: 1st, as to the inspection of steamers and their equipments; 2d, as to a system of pilotage; and 3d, as to the mode of employing engineers. The regulations adopted by this act are declared to be "instead of the (then) present system of pilotage." What system of pilotage was then in existence? Certainly none had been established by Congress. The act of 1838, to which this was an amendment, does not say a word about pilots or engineers. The acts of August 7th, 1789, and March 2d, 1837, had provided that State regulations should prevail until further action by Congress. *470 The system of pilotage, then, which was in existence when the act of 1852 was passed, was the State regulations of each port, almost all of which are substantially the same with the act of the California legislature of 1861. And it was this system which was to be superseded, and the one provided in the act of Congress introduced in its stead. This idea derives support from the significant fact that the decision of this court, holding that the State regulations were in force because no system had been adopted by Congress, was made in the winter of 1851-2; and this act, which provides such a system, was passed by Congress, August 30th, 1852. Unquestionably, Congress intended to supply that very system which the Supreme Court had intimated was needed, and was in the power of Congress to provide.
Let us examine, now, some of the provisions of this act which concern pilots.
Section nine creates a board of inspectors in each of twenty-three different ports of the Union, including San Francisco. Subdivision seven of that section says, that these inspectors shall license and classify all engineers and pilots of steamers carrying passengers. Subdivision nine says: "Whenever any person, claiming to be a skilful pilot for any such vessel, shall offer himself for a license, the board shall make diligent inquiry as to his character and merits, and if satisfied that he possesses the requisite skill, and is trustworthy and faithful, they shall give him a certificate to that effect, licensing him for one year to be a pilot of any such vessel, within the limit prescribed in such certificate." It also provides for revocation of the license for proper cause.
Subsection ten says: "It shall be unlawful for any person to employ, or any person to serve, as engineer or pilot on any such vessel who is not licensed by the inspectors; and any one so offending shall forfeit one hundred dollars for such offence."
Subsections thirteen and fifteen of section 9, and sections 29 and 38, all provide that these pilots shall be under the control of the boards of inspectors; shall take an oath to discharge their duties faithfully; and shall be liable to removal *471 and other penalties for unfaithful or unskilful conduct.
Section 23 requires the collectors of each port to report to the collectors of every other port the pilots licensed at their respective ports. From this provision the port of San Francisco is excepted. The obvious reason is, that being the only port on the Pacific coast where a board of inspectors is established by the law, there is no reason to suppose that pilots will be licensed at other ports for that coast, or at San Francisco for any other than the Pacific coast and ports.
In these enactments, and in the regulations which are authorized to be made of a set of signals in passing each other, we see a system of pilotage as complete, or more so, than any which had previously existed, and, in my judgment, one more judicious, and better calculated to secure safety of life and property than the one provided by the California statute. If, then, the principle be a sound one that, when Congress has provided such a system, those existing under State laws must give way, and if, as it appears manifestly from this act, the system thus provided was intended to be instead of and in exclusion of the State systems, how can the act of the California legislature stand?
It is said that the act of Congress was only intended to provide pilots for a voyage, and is not applicable to the local pilots of the ports. I am not able to perceive anything in the relation of these port pilots to the Federal Government and its right to regulate commerce, or in the nature of the special service which they are expected to perform, which can furnish any ground for this distinction. All the other regulations of commerce extend to the ports, and they are emphatically the theatre where commercial regulations are most needed, and where Congress has oftenest exercised its power to regulate commerce. As to the services usually rendered by these pilots, if they are more difficult and require a higher degree of skill than others, there would seem to be the greater necessity why they should be thoroughly examined and licensed by the proper authority, and also why they should be under the control of proper officers, and subjected *472 to laws and rules calculated to compel a strict performance of their duties. All these are well provided for in the act of Congress.
It seems to be supposed, however, that the pilots licensed under the act of Congress must necessarily be for long voyages, and that such licenses cannot issue limited to the bays and harbors of the various ports. This is a great mistake. The board of inspectors for each port should be as competent to determine the qualifications of these local pilots as any such examiners appointed by the State. That portion of subsection nine of section 9, which I have quoted in italics, says that they are to license a person "to be a pilot on any such vessel within the limits prescribed in his certificate." If, then, the pilot licensed is particularly skilled as a port pilot, and competent for no more, his license will restrict him accordingly. If he is competent for the voyage and not for the harbor, his license will exclude him from piloting in the harbor. This idea is in direct conflict with the language of the act of Congress, which declares that the boards of inspectors "shall license and classify all engineers and pilots of steamers carrying passengers." The opinion assumes, in the face of this language, that there may be a very large class of pilots allowed to exercise their profession without such a license.
Again, all these regulations apply in the same terms of license and prohibition to engineers and pilots. But can it be pretended that a vessel may go into a port and out of it without a licensed engineer, and yet be guilty of no violation of the law? If the statute is only applicable to pilots on a voyage, it must also apply only to engineers on a voyage.
But it is argued that the whole system of pilotage relates to the voyage, and does not include the ports; because a proviso to subdivision ten of section nine says, that if the owners of the boat shall, without default of theirs, be deprived of the services of a licensed pilot or engineer on the voyage, they shall be relieved of the penalty which the law imposes for navigating their vessel without one, until such time as they can procure a licensed pilot or engineer. From *473 this proviso I draw an inference precisely the reverse. For this statute evidently means, that if this loss of the services of a licensed pilot or engineer takes place before the port is left, it is no protection against the penalty, because it may be supplied. And so if it occurs after the port is left, and is not supplied by a licensed pilot as soon as you approach the port where one can be obtained, the protection ceases.
It may be urged that the system provided by Congress is incomplete, because there is no provision for compensation of pilots, and none for compelling vessels to accept, in their due order or rotation, those who may offer. Congress may well have thought that these matters might be prudently left to the laws of supply and demand, and to the ability of the parties concerned to take care of their own interests.
If this principle prevails, that the ports are exempt from the law of Congress as to pilots, I expect to see every town on the lakes, the Mississippi and Ohio Rivers, as well as all their tributaries, passing its ordinances, that when steamboats come within a mile of their landing they must stop and take on board a local pilot, or pay him compensation for refusal. If the States where seaports exist can make laws thus to burden commerce, I see no reason why the States which have towns on navigable rivers should not pass similar laws. I may add here, that if we permit the States to interject their legislation at every point, however minute or unimportant, which they may fancy that Congress has left unoccupied; then in all that class of cases in which it has been held that the States may legislate until Congress acts on the subject, we shall have this piebald, conflicting, and incongruous system of laws, with a persistent struggle, on the part of the States, to control the legislation of Congress.
But not only is the act of the California legislature void, because Congress has provided a system of pilotage which is in its nature exclusive, but it is also void because its provisions are in direct conflict with the act of Congress. The statute of California provides, that if one of the pilots which it recognizes shall offer his services to a vessel and is refused, the owner of the vessel shall pay the penalty; and it does not *474 require, as condition for claiming this penalty, that such pilot shall have the license required by act of Congress. The act of Congress provides, that if any person shall be employed as a pilot on such vessel without such license as it prescribes, the owner shall forfeit the sum of one hundred dollars. Here is a manifest conflict. It is made a part of this case, as found by the court below, that the plaintiff did not have any such license as the act of Congress required. Defendant, notwithstanding this, has been compelled by the State court, under the State law, to pay fifty-two dollars for refusing to take this pilot. If he had accepted him, he would have forfeited to the United States the sum of one hundred dollars for violating the act of Congress. The conflict of the two statutes is too obvious for comment. I think the act of Congress ought to prevail.
NOTES
[*] Argenti v. San Francisco, 16 California 282; Maine on Ancient Law, 844.
[] Cooley v. Board of Wardens of Port of Philadelphia, 12 Howard, 312.
[*] 5 Metcalf, 406
[*] Subdivision 10.
[] Subdivision 15.
[*] Abbott on Shipping, 195; Bouvier's Law Dictionary, term "Pilots."
[*] Statutes of California, 1863-4, page 392.
[] 1 William Blackstone, 451; S.C. more at large in 3 Burrow, 1456.
[] 9 Barnwall & Cresswell, 750.
[§] 4 Moore & Payne, 341.
[*] Butler v. Palmer, 1 Hill, N.Y. 324; Hartung v. The People, 22 New York, 95; Sanches v. The People, Id. 155; Commonwealth v. Duane, 1 Binney, 601; Board of Trustees v. City of Chicago, 14 Illinois, 334; Yeaton v. United States, 5 Cranch, 281; Schooner Rachel, 6 Id. 329.
[] Cited in note, supra.
[] 1 Binney, 601; cited supra, in note.
[§] 1 New Hampshire, 61
[] 5 Cranch, 281.
[¶] 6 Id. 329.
[*] 13 Howard, 429.
[*] 14 Illinois, 334.
[*] 12 Howard, 299.